UNITED STATES of America, Appellee,

v.

Grisselle ALICEA and Suzie Cabezas, Appellants.

Nos. 326, 327, Dockets 87–1280, 87–1281.

United States Court of Appeals, Second Circuit.

Argued Oct. 21, 1987.

Decided Jan. 22, 1988.

Bernard Udell, Brooklyn, N.Y., for appellant Alicea.

Thomas H. Nooter, New York City (Freeman, Nooter & Ginsberg, New York City, of counsel), for appellant Cabezas.

Julie Copeland, Asst. U.S. Atty., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., Emily Berger, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for appellee.

Before OAKES, CARDAMONE and MAHONEY, Circuit Judges.

OAKES, Circuit Judge:

The principal question presented by this case is whether two female drug couriers presented sufficient evidence at a pretrial *in limine* hearing to warrant submission of a duress defense to a jury. This procedure was sanctioned in *United States v. Bifield*, 702 F.2d 342, 347 (2d Cir.), *cert. denied*, 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983), a case involving a prison escape, though appellants question its use here. The United States District Court for the Eastern District of New York, Thomas C. Platt, Judge, held that the procedure was proper and that the evidence failed to establish a defense of duress. Thereafter, the appellants executed a written waiver of a jury trial and agreed to a trial on stipulated facts. The court found Alicea and Cabezas guilty on all three counts of conspiracy to possess and to distribute in excess of 500 grams of cocaine, importation of that cocaine, and possession of the cocaine with intent to distribute it, in violation of 21 U.S.C. §§ 841(a)(1), 846, 952(a), and 960(a)(1) (1981 & Supp.1987). Both appellants were sentenced to three concurrent five-year terms of imprisonment, special assessments of $150 and four-year terms of supervised release on the importation and possession counts. We affirm.

Prior to trial the Government moved to exclude Alicea and Cabezas from presenting evidence supporting a duress defense, claiming that their evidence of duress was insufficient as a matter of law. At the hearing on the motion, Alicea and Cabezas testified that they had gone to Ecuador for a vacation on December 15, 1986, originally planning to stay only one week. While there, they decided to remain a few days longer and cancelled their December 22 return reservations. They missed their first rescheduled flight on December 25, and their second rescheduled flight on December 28 was cancelled. They then arranged a flight to New York, with a stopover in Miami, for January 2, 1987, and arrived at the airport that day two and one-half hours before the flight was scheduled to depart.

According to Alicea and Cabezas, just after they arrived at the airport in Ecuador and were walking toward the terminal, they were approached by two men who asked if they were going to New York. When the women did not respond, one man put his hand in his pocket as if he had a gun and pointed it at Alicea. Instructed to do exactly as they were told, Alicea and Cabezas then followed the men into a nearby Mercedes. The two men pushed the appellants' heads down so that they could not see where they were going while a third man drove them to a house. Inside the house the women were told to undress and to put on a "girdle," which was actually a pink body suit and a T-shirt. When one of the men attempted to strap packages of cocaine to Alicea's body suit, she resisted. The man who had driven the automobile then forced Alicea into an adjoining room and raped her. Cabezas, who could hear Alicea's screams from the next room, was told that if she did not comply, she, too, would be raped. The men then

taped the packages to the body suits and the women put their clothes back on. One of the men made a telephone call to New York, describing the two women and giving the recipient of the call information about where they lived in New Jersey, having obtained the information by examining the contents of their purses. The man who had looked through the purses singled out a picture of Cabezas' daughter, threatening that harm would come to her if their demands were not met. The men told the women that someone would be watching them on the airplane and warned them not to try "anything."

The men then drove them back to the airport, checked them in, escorted them to the security area and left them to board the plane. After going through the metal detection device, appellants waited some twenty minutes before boarding the plane, during which time, out of fear, they did not report their predicament to anyone or try to get rid of the cocaine. They boarded the plane at about noon and sat together. Both Alicea and Cabezas testified that a man seated in their same row, three seats away toward the middle of the airplane, stared at them constantly, at one point asking them for a match. The women believed that this was the man whom their abductors had said would be watching them. Appellants testified that because they were in constant terror they did not seek assistance from a stewardess, or even attempt to go to the lavatory during the nine-hour flight (although at some point during the flight Cabezas fell asleep).

During the plane's scheduled stop in Miami, the women neither split up nor deplaned to seek help. On the plane Alicea was given a Customs declaration to fill in and submit to officials upon arrival in New York, but she wrote no request for help on it. When appellants arrived at Kennedy Airport, the "watcher" followed them off. While he did not stay directly behind them, the women assumed he was near enough to be a threat. Cabezas, an Ecuadorian citizen, was interviewed separately by an Immigration official outside the presence of the "watcher." Although she asked the official several times to check her passport,

Cabezas did not tell the official that she had been forced to carry cocaine into the country.

Cabezas cleared the Customs inspection first, with the "watcher" close behind, according to appellants' testimony. But when the inspector reached over to assist Alicea, he touched her back and felt something hard. When he asked her what it was, Alicea replied that it was a body cast. The Customs inspector then took her to a more private area for a secondary search. Cabezas, although she already had been cleared and was free to leave, went with Alicea and also submitted to the search. Inside the secondary search rooms Alicea and Cabezas told the officials how they had been forced to carry cocaine, although neither mentioned the rape. At the hearing Alicea testified that at the time she had been too ashamed to let her family know about the assault. A month later, however, when she discovered that she had become pregnant as a result of it, she arranged to have an abortion at the Metropolitan Correctional Center and confided the incident to a staff psychologist there.

Relying on the testimony of the two women, Judge Platt nevertheless found that they had not overcome the *Bifield* preclusion test that "[w]here the evidence, even if believed, fails to establish all of the elements of the duress defense, the trial court may rule upon the defense as a matter of law and need not submit it to the jury." *Bifield*, 702 F.2d at 346. In the judge's view, there was no evidence to sustain the factual dispute as to two elements of the alleged defense, namely, that "there must be no time for a complaint to the authorities or there must exist a history of futile complaints which make any benefit from such complaints illusory"; and that "the defendant must intend to report immediately to the proper authorities when she attains a position of safety from the immediate threat." The court's opinion emphasized that Alicea and Cabezas were free from their abductors for at least twenty minutes prior to boarding the plane in Ecuador. During the nine-hour flight, each of the appellants had an opportunity to

separate herself from her companion and the alleged "watcher," and to complain to the cabin attendants or the officers on the airplane. The stopover at the Miami airport presented an even greater opportunity to elude the "watcher" and alert the authorities. Finally, the court pointed out, Cabezas had a full and free opportunity to seek the assistance of the Immigration officers during her private interview, and both appellants had the opportunity to seek assistance from the Customs inspectors on their arrival in New York. From these facts Judge Platt found it "abundantly evident" that "neither defendant intended to 'report immediately to the proper authorities when [they] obtain[ed] a position of safety from the immediate threat' and that there was ample time for them to complain to or seek the assistance of the authorities, and they never did so" (quoting *Bifield*, 702 F.2d at 346 (quoting *United States v. Boomer*, 571 F.2d 543, 545 (10th Cir.), *cert. denied*, 436 U.S. 911, 98 S.Ct. 2250, 56 L.Ed.2d 411 (1978))).

## DISCUSSION

■ Appellants' first argument is that *United States v. Bifield* has no application in a case not involving a prison escape. Thus, they claim, the district court's reliance on the elements of the duress defense catalogued in *Bifield* is "simply wrong." Rather, their argument runs, the court should have followed *United States v. Mitchell*, 725 F.2d 832 (2d Cir.1983), which reiterated the requirements of a duress defense in a passage quoted from *United States v. Agard*, 605 F.2d 665, 667 (2d Cir.1979), as follows:

> A claim of duress and coercion constitutes a legal excuse for criminal conduct when, at the time the conduct occurred, the defendant was subject to actual or threatened force of such a nature as to induce a well-founded fear of impending death or serious bodily harm from which there was no reasonable opportunity to escape other than by engaging in the otherwise unlawful activity.

725 F.2d at 837. According to appellants, there is no surrender or reporting require-

ment under *Mitchell*. They concede, however, that *Mitchell* contains an "inescapability" requirement, which under some circumstances may involve assessment of a defendant's opportunity to escape by seeking assistance from authorities.

Appellants cite a Ninth Circuit case, *United States v. Jennell*, 749 F.2d 1302, 1305 (9th Cir.1984) (amended), *cert. denied*, 474 U.S. 837, 106 S.Ct. 114, 88 L.Ed.2d 93 (1985), for the proposition that while assessing a defendant's chances to report may be appropriate, the defendant's perception of whether such an effort would be futile presents a factual question to be put to the jury. *Id.* at 1305–06. The Government concedes that in adapting the criteria set out in *Bifield* the district court incorrectly identified two elements of the duress defense. In other words, there is no express duty in a non-prison escape case to "report to authorities." However, that element is subsumed in the *Mitchell* requirement that where there is a reasonable opportunity to escape the threatened harm, the defendant must take reasonable steps to avail himself of that opportunity, whether by flight or by seeking the intervention of the appropriate authorities. The appellants here clearly took no steps, reasonable or otherwise, to extricate themselves from the danger of the "watcher."

The principal issue then is whether those occasions when Alicea and Cabezas were, or could have been, separated from their captors and the "watcher" presented "reasonable opportunities for escape." Alicea and Cabezas argue that this court should follow the Ninth Circuit's *United States v. Contento-Pachon*, 723 F.2d 691 (9th Cir. 1984), in requiring the issue of reasonableness to be passed on by the jury. But *Contento-Pachon* is distinguishable. There, the court held that the possibility that the Colombian police were paid informants for drug traffickers created an issue of fact as to the reasonableness of seeking assistance from that source. Furthermore, Contento-Pachon's family, whom he claimed had been threatened, lived in the same city as the drug dealers and thus were subject to more immediate danger. If, as it appeared, Contento-Pachon's only

alternative to carrying the drugs into the United States was to flee Colombia with his wife and three-year-old child, "[a] juror might find that this was not a reasonable avenue of escape." *Id.* at 694. Alicea and Cabezas presented no such special circumstances in their testimony. True, there was testimony that threats were made against appellants' families in New Jersey, and specifically against Cabezas' daughter. Even so, there is no evidence that Alicea or Cabezas made any attempt either to seek protection from the authorities for their families or to telephone a warning directly to their relatives when they had an opportunity to do so. As was held in *Rhode Island Recreation Center, Inc. v. Aetna Casualty & Surety Co.*, 177 F.2d 603, 605–06 (1st Cir.1949), a defendant acting under a threat of death to relatives may be denied the defense of duress when he commits a crime after he had an opportunity to contact police. *Rhode Island Recreation Center*, though not the most contemporary of cases, was cited with approval in *United States v. Bailey*, 444 U.S. 394, 410 n. 8, 100 S.Ct. 624, 635 n. 8, 62 L.Ed.2d 575 (1980), for the proposition that where there was " 'a chance both to refuse to do the criminal act and also to avoid the threatened harm,' the [duress] defense[ ] will fail." 444 U.S. at 410, 100 S.Ct. at 635 (citation omitted). *See also United States v. Esposito*, 834 F.2d 272, 275–76 (2d Cir.1987).

■ Alicea and Cabezas' next argument is that the trial judge's ruling effectively deprived the defendants of their constitutional right to testify on their own behalf, as recently endorsed in *Rock v. Arkansas*, —— U.S. ——, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). They suggest that *Bifield* should be reexamined in the light of *Rock*, arguing that where virtually everything the defendant has to say about the facts of the alleged crime is precluded because his explanation necessarily contains facts of the stricken defense, then such a limitation on the defendant's right to testify runs afoul of *Rock*. Nothing in the reasoning of *Rock*, however, suggests its application here. In *Rock* the Court found that Arkansas's per se rule excluding testimony obtained under hypnosis was arbitrary, thus infringing the defendant's constitutional right to testify. By contrast, the practice of which Alicea and Cabezas complain requires an individual assessment of the legal sufficiency of a defense before ruling on its exclusion. Only where the evidence would be insufficient to warrant a jury charge on the defense is it excluded at trial, and even then, only evidence as to the asserted defense is precluded. *Bifield*, of course, relied on the rationale supporting *United States v. Bailey*, 444 U.S. at 416, 100 S.Ct. at 637–38, that in the interest of judicial economy, juries should not be burdened with testimony relating to duress and necessity where it can be determined that the asserted defense fails as a matter of law. *See Bifield*, 702 F.2d at 346–47. We see no need to reexamine *Bifield* by virtue of *Rock*.

■ Alicea and Cabezas' third claim is that in requiring them to present their defense before the Government rested its case, the Government was given unwarranted discovery. But we have recently held that *in limine* motions and rulings are permitted " 'pursuant to the district court's inherent authority to manage the course of trials.' " *United States v. Valencia*, 826 F.2d 169, 171 (2d Cir.1987) (quoting *Luce v. United States*, 469 U.S. 38, 41 n. 4, 105 S.Ct. 460, 463 n. 4, 83 L.Ed.2d 443 (1984)). Indeed, here all the evidence supposedly discovered by the Government in the pretrial hearing related to a defense that had been known to the Government from the time of arrest. Moreover, since the case was decided on stipulated facts, the Government did not use any "discovered" evidence to appellants' disadvantage. In short, while use of the pretrial procedure undoubtedly changed the defendants' litigation strategy, it cannot be said that such a result was unfair.

Judgment affirmed.